UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.  MJ25-196 |
| Plaintiff, | |
| | COMPLAINT for VIOLATION |
| v. | |
| STEVEN GOLDSTINE, | Title 18 U.S.C. § 922(g)(1), 924(a)(2) |
| Defendant. | Title 26 U.S.C. § 5861(d), 5845(a)(8), (f) |

BEFORE, the Honorable Michelle L. Peterson, United States Magistrate Judge,

United States Courthouse, Seattle, Washington.

The undersigned complainant being duly sworn states:

## COUNT 1

### (Unlawful Possession of a Destructive Device)

On or about December 31, 2024, in Snohomish County, within the Western

District of Washington, STEVEN GOLDSTINE knowingly possessed a destructive

Complaint - 1
United States v. GOLDSTINE
USAO 2025R00436

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

device, that is, a pipe bomb made from an explosive and metal pipe parts, which was not registered to him in the National Firearms Registration and Transfer Record.

All in violation of Title 26, United States Code, Sections 5861(d) and 5845(a)(8) and (f).

## COUNT 2

### (Unlawful Possession of Ammunition)

On or about March 17, 2025, in Snohomish County, within the Western District of Washington, STEVEN GOLDSTINE, knowing he had been convicted of the following crimes punishable by imprisonment for terms exceeding one year:

- *Possession of Stolen Property in the Second Degree*, in Snohomish County Superior Court, Washington, under cause number 98-1-01158-5, on or about December 8, 1998, and

- *Second Degree Arson* (Two Counts), in King County Superior Court, Washington, under cause number 89-1-03140-6, on or about October 31, 1989, and

- *Second Degree Burglary,* in King County Superior Court, Washington, under cause number 89-1-03140-6, on or about October 31, 1989,

did knowingly possess, in and affecting interstate and foreign commerce, ammunition, including Hornady 9x19mm rounds of ammunition and Winchester 9x19mm rounds of ammunition, which had been shipped and transported in interstate and foreign commerce.

All in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2).

//

//

## COUNT 3

### (Unlawful Possession of a Firearm)

On or about September 17, 2020, in Snohomish County, within the Western District of Washington, STEVEN GOLDSTINE knowing that he had been convicted of the following crimes punishable by imprisonment for terms exceeding one year:

- *Possession of Stolen Property in the Second Degree*, in Snohomish County Superior Court, Washington, under cause number 98-1-01158-5, on or about December 8, 1998, and

- *Second Degree Arson* (Two Counts), in King County Superior Court, Washington, under cause number 89-1-03140-6, on or about October 31, 1989, and

- *Second Degree Burglary,* in King County Superior Court, Washington, under cause number 89-1-03140-6, on or about October 31, 1989

did knowingly possess, in and affecting interstate and foreign commerce, a firearm, namely: a Hi Point Model C 9x19mm pistol, that had been shipped and transported in interstate and foreign commerce.

All in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2).

The undersigned, Gregory Heller, complainant being duly sworn, further deposes and states as follows:

## INTRODUCTION

1.      I am a duly sworn member of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF.) I am currently assigned to the ATF Seattle III Field Office located within the Seattle Field Division. I have been employed as a special agent since September 2014. From 2007 to 2014, I was employed as a police officer and detective in

Complaint - 3
United States v. GOLDSTINE
USAO 2025R00436

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Gwinnett County, Georgia. In total, I have approximately 17 years of state and federal law enforcement experience.

2.      I am a graduate of Duke University in Durham, North Carolina, where I received a Bachelor of Science in Engineering (B.S.E.) in Civil Engineering. I completed a 12-week Criminal Investigator Training Program (CITP) and a 14-week Special Agent Basic Training (SABT) at the ATF National Academy/ Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. I also completed a 23-week Gwinnett County Police Training Academy and was a Peace Officer Standards and Training (P.O.S.T.) certified peace officer in the State of Georgia.

3.      I am currently assigned to the ATF Seattle III Field Office (an arson and explosives group), and primarily conduct investigations related to the criminal use of fire or explosives. I am also responsible for enforcing federal firearms and explosives laws and related statutes in the Western District of Washington. I received training on the proper investigative techniques for these violations. I have actively participated in investigations of criminal activity, including but not limited to crimes against persons, crimes against property, fire and explosive related crimes, and crimes involving the possession, use, theft, or transfer of firearms. During these investigations, I have also participated in the execution of search warrants and the seizure of evidence indicating the presence of criminal violations. As a law enforcement officer, I have testified under oath, sworn to applications for search and arrest warrants, and obtained electronic monitoring orders.

4.      The facts set forth in this Affidavit are based on my own personal knowledge; information obtained from other individuals during my participation in this investigation, including other law enforcement officers; review of documents and records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my

Complaint - 4
United States v. GOLDSTINE
USAO 2025R00436

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  training and experience. Because this Affidavit is submitted for the limited purpose of

2  establishing probable cause in support of a criminal complaint, it does not set forth every

3  fact that I, or others, have learned during this investigation.

4  **SUMMARY OF PROBABLE CAUSE (COUNTS 1 AND 2)**

5  5.    On December 31, 2024, Everett Police Department (EPD) officers

6  responded to an explosion at an apartment complex in Everett, Washington. When they

7  arrived, EPD officers found that a Ford Explorer had been damaged while it was parked

8  in front of the building. The officers spoke with the owner of the vehicle, VICTIM-1, and

9  her husband, VICTIM-2, who both resided at the apartment complex. VICTIM-1 and

10  VICTIM-2 provided surveillance video which showed a suspect had approached on foot,

11  lit an item with a cigarette, and threw the item through the back windshield of the

12  Explorer. Shortly thereafter, the video showed an explosion inside the Explorer. Below

13  are images from the surveillance video. The left image shows the suspect throwing a lit

14  item through the rear windshield and into VICTIM-1's vehicle. The right image shows a

15  portion of the ensuing explosion.

 

25  6.    The responding officers saw that VICTIM-1's vehicle was heavily

26  damaged. They documented the damage with photographs but did not collect evidence at

Complaint - 5
United States v. GOLDSTINE
USAO 2025R00436

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

that time. VICTIM-1 and VICTIM-2 told the officers that they believed the suspect who damaged their vehicle was Steven GOLDSTINE. They referenced prior disputes and issues with him. After an initial delay, EPD detectives began investigating the case. They located the damaged Explorer at a tow yard and processed it. They collected evidence from inside the vehicle, which I subsequently reviewed.

7.      I saw that the evidence consisted of an approximately 12-inch metal pipe nipple (segment of pipe with male threads on both ends), a damaged endcap, and metal fragments. One end of the pipe nipple had failed. The metal on that end up the pipe had torn, expanded outwards, and much of the threading was gone. The other end of the pipe nipple had an endcap attached. The endcap was damaged—in that an approximately circular section at the tip of the cap was missing. In the middle of the pipe nipple was a small circular hole that extended from the exterior of the pipe to the interior. I saw that the fragments included pieces of damaged metal threads and endcap.  (Below are several photographs of the recovered evidence.)






Complaint - 6
United States v. GOLDSTINE
USAO 2025R00436

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

8.      VICTIM-1 and VICTIM-2 were contacted by detectives. They provided a copy of a voicemail VICTIM-1 received at 4:06PM on January 1, 2025 (the day after the explosion.) The caller said, "Hey you dumb ass fucking nigger... Are you still having breathing problems?... Umm. How is your car running?... Boy, what an explosion that was... Stupid Bitch." The voicemail came from a generic outgoing number from Providence Hospital.

9.      When contacted by detectives and later when I interviewed them, VICTIM-1 and VICTIM-2 were adamant that the suspect who bombed their car and the suspect who left the voicemail were both Steven GOLDSTINE. VICTIM-1 specifically said that she recognized the voice on the voicemail as GOLDSTINE because she had talked to him on prior occasions.

10.      VICTIM-1 explained that she had not known GOLDSTINE until he began to come to the apartment building in which she lived to visit another resident named "Jerry" in apartment #3. VICTIM-1 explained that she had health issues that affected her breathing (she wore an oxygen administration device during my interview with her) and that second-hand smoke caused her to have breathing problems. She said when GOLDSTINE came over to visit Jerry, GOLDSTINE sometimes smoked near the building. VICTIM-1 said that the way her apartment was situated, the smoke would make its way into her apartment and cause problems with her breathing. VICTIM-1 said that individuals smoking near the building was something she regularly had to report to her landlord.

11.      VICTIM-1 further explained that on October 13, 2023, GOLDSTINE, Jerry, and Jerry's wife had been standing in the apartment parking lot by her car smoking. (VICTIM-1 knew the date because she had a photograph on her phone of the trio in the parking lot.) When VICTIM-1 complained from her balcony, all three subjects (GOLDSTINE, Jerry, and Jerry's wife) called VICTIM-1 a "bitch ass nigger." VICTIM-1

Complaint - 7
United States v. GOLDSTINE
USAO 2025R00436

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

and VICTIM-2 are black; GOLDSTINE is white. VICTIM-1 said GOLDSTINE also threatened to come up to her apartment and assault her, but no assault actually occurred. VICTIM-1 said she called the police but they did not respond until much later that day.

12.    VICTIM-1 also described another occasion soon after the smoking incident where VICTIM-2 and GOLDSTINE got into a physical fight. When I spoke with VICTIM-2, he explained that he had seen GOLDSTINE at the apartment complex and confronted him about the language he had used about his wife. VICTIM-2 said that GOLDSTINE pulled out a knife, so he attacked him. VICTIM-2 said the police came and GOLDSTINE went to the hospital, but no one was arrested.

13.    VICTIM-1 and VICTIM-2 also described ongoing damage to their vehicle when it was parked at their apartment. They said that on several occasions tires were slashed and windows were broken. Both VICTIM-1 and VICTIM-2 believed GOLDSTINE was responsible, though they had not seen him commit the vandalism.

14.    An EPD detective compared the voicemail left on VICTIM-1's phone on January 1, 2025 to previous body-camera video of GOLDSTINE and to 911 calls placed by GOLDSTINE. He believed that the voice on the voicemail sounded consistent with the known audio of GOLDSTINE.

15.    Detectives obtained surveillance footage of the bombing from VICTIM-1, obtained footage from an ATM at a building immediately south of the apartment complex, and obtained footage from another nearby building. GOLDSTINE's residence is approximately 0.4 miles southwest of VICTIM-1's apartment. The surveillance video footage showed that the suspect left the area on foot to the southwest. The footage also showed the suspect was wearing an olive-green, zip-up jacket with a hood, cargo-type pants, a watch cap, and distinctive shoes. The ATM video showed that the suspect wore brown boots/shoes that had a light-colored or reflective spot near the outer toe area, a light-colored or reflective spot near the outside of the upper lace area, and a light-colored

Complaint - 8
United States v. GOLDSTINE
USAO 2025R00436

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

or reflective spot on the outside of the heel. The boots also had an irregular black pattern near the outside of the ankle area and a curved black portion near the outer heel.

16.     As part of the investigation, EPD conducted video surveillance of GOLDSTINE's residence. Investigators obtained video and images of GOLDSTINE wearing boots that appeared to match those worn by the suspect. Investigators also obtained video and images of GOLDSTINE wearing an olive-green jacket similar to the one worn by the suspect.

17.     An EPD detective established probable cause for GOLDSTINE's arrest and obtained a Snohomish County Superior Court search warrant for GOLDSTINE's residence. On March 17, 2025, the detective contacted GOLDSTINE, who came to a police precinct to speak with the detective. After he was advised of his *Miranda* Rights, the EPD detective and I interviewed GOLDSTINE. GOLDSTINE described the ongoing dispute with VICTIM-1 and VICTIM-2. His account differed slightly from that of VICTIM-1. GOLDSTINE denied using the N-word to VICTIM-1, claimed that VICTIM-2 had assaulted him in an unprovoked attack, and alleged that on an occasion after the bombing, VICTIM-2 had come to his house and attempted to open GOLDSTINE's car door while he was seated in it.

18.     During the initial part of the interview, GOLDSTINE made statements regarding the race of VICTIM-1 and VICTIM-2. Referring to police he said, "you people better deal with him. This crap of black people putting their hands on white people for no reason ain't flying no more. Take care of it."

19.     He also said that VICTIM-1 had accused him of calling her a "nigger." Of VICTIM-1 he said, "the wife told her husband that I called her a nigger. And I didn't use the word nigger, but I am now."

20.    In the context of a discussion about VICTIM-1, GOLDSTINE said, "call me a racist call me whatever you want, but everyone in this room knows exactly how those people act."

21.    During the initial part of the interview GOLDSTINE took a piece of paper out of his pocket with VICTIM-1's and VICTIM-2's names and phone numbers written on it. He said he had obtained the information by requesting police reports and said he had written the information down on the piece of paper for his "personal needs." He also said he had photographs of VICTIM-1's and VICTIM-2's apartment, their vehicle, and their friends.

22.    When the investigators explained that they were investigating the December 31, 2024, bombing of VICTIM-1's car, GOLDSTINE denied any sort of issue between him and VICTIM-1 that day. He said he did not go over to VICTIM-1's apartment building that day. GOLDSTINE said he had been at home watching a movie on Tubi TV. He said one of the movies he had watched was "Bad Moon." I further clarified that the incident took place around 5:30PM. GOLDSTINE said it would have been dark at that time and maintained that he was watching a movie.

23.    Throughout the interview, the investigators explained that they believed GOLDSTINE was the suspect who had thrown an explosive into VICTIM-1's car and asked GOLDSTINE to explain the "why" behind his actions. GOLDSTINE maintained that he was not the suspect. When played the audio recording of the voicemail left on VICTIM-1's phone, GOLDSTINE claimed he had not made the call and that the voice on the recording was not his.

24.    When told that investigators were searching his residence pursuant to a search warrant, GOLDSTINE said investigators would find ammunition. GOLDSTINE said the ammunition was left over from when he had a gun. (He said the gun had been seized from him five years earlier.) GOLDSTINE said there were 740 rounds of

Complaint - 10
United States v. GOLDSTINE
USAO 2025R00436

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    ammunition. When asked about the brand and caliber of the ammunition, he said it was

2    nine-millimeter Winchester. He said back when he had his gun, he would quickly go

3    through three or four hundred rounds. He said he typically purchased the ammunition at

4    Walmart because it had cheap prices.

5        25.    When searching GOLDSTINE's residence, investigators located a pair of

6    boots that appeared to match the ones the suspect was wearing at the time of the

7    bombing. The boots were brown and black. There were lighter mesh areas visible from

8    the side near the outer toe and light-colored lettering on the outside of the heel. The boots

9    also had a black pattern near the outside of the ankle area and another black area

10   separated from the black sole by a lighter gray colored area. Below is a comparison of the

11   boots recovered in the search warrant to those seen in the surveillance video.

 

21        26.    When searching GOLDSTINE's residence, investigators also located an

22   olive-green, zip-up jacket with a hood that appeared consistent with the one the suspect

23   was seen wearing in surveillance video. Below is a comparison of the jacket recovered

24   during the search warrant to the jacket seen on surveillance video.

Complaint - 11
United States v. GOLDSTINE
USAO 2025R00436

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

 

27.    When searching GOLDSTINE's residence, investigators also located ammunition. There were approximately 712 rounds in an ammunition can in the bedroom closet. As GOLDSTINE had indicated, the majority of it was 9x19mm Winchester ammunition. There were also seven other rounds of ammunition on tables in the living room. Some of the ammunition appeared to be displayed as part of knick-knacks and other décor on the tables. These rounds were readily visible to anyone in the room.

28.    Below are photographs of the ammunition recovered from GOLDSTINE's residence. The first photograph depicts the approximately 712 rounds located in the ammunition can in the bedroom closet of GOLDSTINE's residence. 700 of those rounds are Winchester 9x19mm ammunition. The second two photographs depict the seven additional rounds that were displayed in the living room in GOLDSTINE's residence. Three of those rounds were Hornady 9x19mm ammunition.



Complaint - 12
United States v. GOLDSTINE
USAO 2025R00436

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

 

29.     The Everett residence where the ammunition was located is the address listed on GOLDSTINE's driver's license. It is the address to which his Cadillac Deville is registered. At the time of the search warrant, the Cadillac registered to GOLDSTINE was parked next to the residence. GOLDSTINE has been contacted at the residence by EPD on several occasions. GOLDSTINE was seen at the residence by investigators conducting surveillance related to this case. When searching the residence, investigators located mail in GOLDSTINE's name with the Everett residence listed on it. They also located a casino card with GOLDSTINE's name on it and photographs of GOLDSTINE.

30.     I have consulted with an ATF special agent who is an interstate nexus expert regarding the Winchester and Hornady ammunition. I learned that neither of those brands of ammunition is manufactured in the state of Washington.

31.     A destructive device examiner employed by the ATF National Center for Explosives Training and Research reviewed reports, photographs, and videos related to this investigation. It is his opinion that the explosive device in this case is consistent with the construction and characteristics of a destructive device as defined by federal law. A final written opinion is pending laboratory analysis and physical examination of the evidence.

32.     I requested the ATF National Firearms Act Branch conduct a query of the National Firearms Registration and Transfer Record (NFRTR) for STEVEN

Complaint - 13
United States v. GOLDSTINE
USAO 2025R00436

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    GOLDSTINE. I reviewed the results and saw that GOLDSTINE did not have any

2    firearms or destructive devices registered to him in the NFRTR.

3        33.    I have reviewed a National Crime Information Center (NCIC) criminal

4    history report for GOLDSTINE. The report showed that he has a felony criminal

5    conviction for 2nd Degree Burglary, two felony convictions for 2nd Degree Arson, and a

6    felony conviction for Possession of Stolen Property. The criminal history report reflects

7    that for each of those convictions, he was sentenced to more than 12 months in prison.

8        34.    GOLDSTINE's NCIC criminal history report shows that GOLDSTINE had

9    an arrest in 2020 for 2nd Degree Assault and Unlawful Possession of a Firearm. These

10   charges do not show a disposition, and I have learned that they are still pending.

11                    **SUMMARY OF PROBABLE CAUSE (COUNT 3)**

12       35.    On September 4, 2020, in Everett, Washington, protestors reported to

13   police that a male driving an older green sedan had pointed a firearm at the group. There

14   were photos and a video from the incident, which showed the license plate of the

15   involved vehicle. EPD detectives were able to determine the vehicle was a 1978 Cadillac

16   Deville registered to Steven GOLDSTINE. GOLDSTINE appeared to match the suspect

17   depicted in the video who displayed a firearm.

18       36.    On September 17, 2020, EPD officers contacted GOLDSTINE at his

19   residence in Everett (the same residence where the ammunition was located on March 17,

20   2025). GOLDSTINE consented to a search of his vehicle, and officers located a loaded

21   pistol magazine inside. After being advised of his *Miranda* Rights, GOLDSTINE

22   confessed he had pointed a High Point 9mm pistol at protesters. GOLSTINE said he had

23   been frustrated with the protesters and riots. GOLDSTINE said the pistol was inside his

24   residence, told detectives where it was, and consented to a search of the residence.

25

26

Complaint - 14
United States v. GOLDSTINE
USAO 2025R00436

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

37.     Officers located a Hi Point Model C 9x19mm pistol with serial number 811468 on the lower shelf of a wicker coffee table in the living room of GOLDSTINE's residence. The pistol had a loaded magazine inserted, but no round in the chamber.

38.     The firearm remained in EPD custody until March 28, 2025. At that point I took it into ATF custody, where it remains. I have consulted with an ATF special agent who is an interstate nexus expert regarding the Hi Point pistol. I learned that it was not manufactured in the State of Washington. A photograph of the Hi Point Model C 9x19mm pistol with serial number 811468 is below:



39.     Based on the above facts, I respectfully submit that there is probable cause to believe that STEVEN GOLDSTINE knowingly possessed a destructive device that was not registered to him in the National Firearms Registration and Transfer Record, in violation of Title 26, United States Code, Sections 5861(d) and 5845(a)(8) and (f), and, knowing that he had been convicted of felony crimes punishable by more than one year in prison, knowingly possessed a firearm and ammunition that had been shipped and transported in interstate commerce, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2).

Complaint - 15
United States v. GOLDSTINE
USAO 2025R00436

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    I am submitting this Affidavit and Complaint by reliable electronic means

2  pursuant to Federal Rules of Criminal Procedure 4.1 and 41(d)(3).

3

4                                                          Digitally signed by
                                                           GREGORY HELLER
                                                           Date: 2025.04.08 09:53:25
                                                           -07'00'
5  _____
   GREGORY HELLER, Complainant
6  Special Agent, ATF

7

8    The above agent provided a sworn statement attesting to the truth of the contents

9  of the foregoing Affidavit and Complaint on the  9th  day of April 2025. Based on the

10  sworn statement and Complaint, the Court hereby finds that there is probable cause to

11  believe the Defendant committed the offenses set forth in the Complaint.

12

13    Dated this ____9th____ day of April 2025.

14

15

16  _____
   MICHELLE L. PETERSON
17  United States Magistrate Judge

18

19

20

21

22

23

24

25

26

Complaint - 16
United States v. GOLDSTINE
USAO 2025R00436

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970