The Honorable John H. Chun

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STEVEN GOLDSTINE,<br><br>Defendant. | NO. CR25-082 JHC<br><br>UNITED STATES'<br>SENTENCING MEMORANDUM<br><br>Sentencing: Dec. 15, 2025 at 9:00 a.m. |

## I. INTRODUCTION

In the early evening hours of December 31, 2024, Steven Goldstine walked approximately one-half mile from his house to the victims' apartment, threw a homemade pipe bomb into the victims' unoccupied car, and ran away. The bomb exploded inside the car—just a few yards outside the victims' apartment. The car was a total loss. The next day, Goldstine called VICTIM-1, a black woman, to gloat. He left a voicemail calling VICTIM-1 a "nigger" and a "stupid bitch" and, referring to her chronic health condition, asked, "Are you still having breathing problems?"

This was not the first (or last) time Goldstine expressed violent hatred for black people. About three years before the bombing, in May 2022, Google reported Goldstine's

U.S. Sentencing Memorandum - 1
*United States v. Goldstine* / CR25-082 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

personal account to the FBI because his account was posting violent, racist YouTube comments like "KILL THEM NIGGERS" and "STUPID MONKEYS. JUST SHOOT THEM DEAD." PSR ¶ 32. About five years before the bombing, Goldstine filmed himself shooting target practice with a gun that he illegally possessed and remarked, "'BLDM' . . . Black lives don't matter." Exhibit 5 (Video). Goldstine's property manager told investigators that Goldstine "hated" people of color and that Goldstine would express those sentiments to "anyone that would listen." Goldstine's property manager was so concerned about Goldstine's open hatred of black people that she did not place black people into housing near Goldstine, out of fear for their safety. Exhibit 6 (Interview of W-1). Even in the weeks after the bombing, Goldstine joked about burning a cross and lynching people on Martin Luther King, Jr.'s birthday. PSR ¶ 32.

The Sentencing Guidelines instruct the Court to apply a three-level enhancement if the Court "determines beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived race [or] color . . . of any person." U.S.S.G. § 3A1.1. The United States asks the Court to impose a sentence of 78 months in custody, which represents a sentence at the high-end of the United States Sentencing Guidelines range that includes the § 3A1.1 enhancement. Even if the Court does not apply the § 3A1.1 enhancement, the United States still believes that 78 months is the appropriate sentence under the § 3553(a) factors, even if this sentence requires an upward variance from the Guidelines range determined by the Court.

## II.   OFFENSE CONDUCT

Goldstine pleaded guilty to the three felony counts alleged in the Indictment. Count 1 involves Goldstine's illegal possession of an unregistered destructive device, that is, a pipe bomb, on December 31, 2024. Count 2 involves Goldstine's illegal possession of approximately 700 rounds of ammunition, which were found in his home during a March 2025 search for evidence of the December 31 bombing. Count 3 involves

U.S. Sentencing Memorandum - 2
*United States v. Goldstine* / CR25-082 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Goldstine's illegal possession of a firearm in September 2020, when he pointed a pistol at people attending a protest in Everett.

### A.   Count 1: Unlawful Possession of a Destructive Device on Dec. 31, 2024

#### 1.   The Pipe Bomb.

On December 31, 2024, around 5:30 p.m., Steven Goldstine left his house and took a 10-minute walk to the apartment complex where VICTIM-1 and VICTIM-2 lived. He was carrying an illegal homemade pipe bomb, and he had one objective: to blow up the victims' car.

Goldstine arrived at the victims' apartment complex and approached their car, which was parked outside their apartment unit. He lit the fuse, threw the bomb through the car's rear window, and took off running. The broken window set off the car alarm. The bomb fuse burned inside the car for about 30 seconds and then the bomb exploded. *See* Exhibit 1 (Video).

 

Fortunately, during that 30-second window while the car alarm was sounding and the fuse was burning, the victims did not leave their apartment to check on the alarm, and no one was near the car when the bomb went off. The blast destroyed the car's interior, and the vehicle was a total loss. Investigators later recovered the homemade pipe bomb from the backseat area.

U.S. Sentencing Memorandum - 3
*United States v. Goldstine* / CR25-082 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970






On January 1, the day after the bombing, VICTIM-1 received a call from Providence Hospital. The caller left a voicemail but did not identify himself. VICTIM-1 recognized the voice, though; it was Steven Goldstine. Goldstine said, "Hey, you dumb ass fucking nigger . . . Are you still having breathing problems? . . . Ummm. How is your car running? . . . Boy, what an explosion that was . . . Stupid bitch." Exhibit 2 (Voicemail).

### 2.    Goldstine's Motives.

Goldstine's malice toward the victims began in the fall of 2023, when he was regularly visiting a friend who lived at the victims' apartment complex. VICTIM-1 has a chronic respiratory issue and uses supplemental oxygen, so she is sensitive to cigarette

U.S. Sentencing Memorandum - 4  
United States v. Goldstine / CR25-082 JHC

UNITED STATES ATTORNEY  
700 STEWART STREET, SUITE 5220  
SEATTLE, WASHINGTON 98101  
(206) 553-7970

smoke. Goldstine and his friends regularly smoked in the parking lot directly below VICTIM-1's apartment unit, and the smoke wafted into her room. VICTIM-1 asked the group to smoke somewhere else, and she complained to her landlord. One day in September 2023, VICTIM-1 was arguing with Goldstine and his friends about smoking. They were cursing at each other and calling each other names. According to VICTIM-1, the situation escalated when Goldstine and his friends started calling her a "bitch ass nigger," and Goldstine said "shut the fuck up before I come up there and do something to you."

VICTIM-1's husband, VICTIM-2, believed Goldstine used different language with a woman than he might use with a man. A few weeks later, when VICTIM-2 saw Goldstine visiting his friend at the apartment building, VICTIM-2 confronted him. VICTIM-2 asked Goldstine if he would use the same offensive language with him as Goldstine had used with his wife. VICTIM-2 said that Goldstine pulled a knife on him, so VICTIM-2 attacked him in self-defense. Goldstine said that VICTIM-2 attacked him without warning or provocation. Regardless, it was clear that VICTIM-2 punched Goldstine, and Goldstine was injured. Everett police officers responded and could not determine how the fight started. No one was arrested.

### 3. The Investigation and Goldstine's Interview.

In the weeks after the bombing, Everett Police Detective Dan Frerichs and ATF Special Agent Greg Heller searched for additional surveillance video that could help identify the bomber. Surveillance video from nearby businesses showed the bomber walking away from the victims' apartment, in the direction of Goldstine's residence. Investigators identified distinctive apparel worn by the bomber in these videos and confirmed, through physical surveillance, that Goldstine owned and wore those same items.

In March 2025, Detective Frerichs obtained a search warrant for Goldstine's house. Everett Police executed the warrant on March 17, 2025. While Everett Police were

U.S. Sentencing Memorandum - 5
United States v. Goldstine / CR25-082 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

searching Goldstine's house, Detective Frerichs and Agent Heller interviewed Goldstine at the Everett Police Station. *See* Exhibit 3a-3e (Interview Video Clips). In discussing the 2023 incident involving the altercation with VICTIM-2, Goldstine claimed that he had been jumped by two men, including VICTIM-2, and expressed anger that nothing had been done about it. Referring to VICTIM-2, Goldstine said, "You people better deal with him. This crap of black people putting their hands on white people for no reason ain't flyin' no more. Take care of it." Exhibit 3a. Then Goldstine removed a piece of paper from his pocket, slammed it on the table, and said, "I've got their phone numbers too . . . I'm not the one to fucking play with." *Id*. The paper contained the victims' phone numbers, and Goldstine also claimed to have "pictures of their cars . . . pictures of their friends' cars . . . pictures of their apartment." *Id*. The investigators asked if Goldstine wrote the phone numbers down to help the investigators, and Goldstine said, "No, I wrote that down for my personal needs." *Id*.

Agent Heller asked how the conflict with the victims started, and Goldstine said, "The wife told her husband that I called her a nigger. And I didn't use the word 'nigger,' but I am now." Exhibit 3a. A moment later, Goldstine said, "Call me a racist, call me whatever you want, but everyone in this room knows exactly how 'those people' act." Exhibit 3b.

Goldstine repeatedly lied to Detective Frerichs and Special Agent Heller during the interview. He emphatically denied bombing VICTIM-1's car and denied calling VICTIM-1 afterward. Exhibit 3c. Goldstine claimed that he had been watching a movie at home when the bombing occurred. Exhibit 3d. But Goldstine's video streaming subscription had no record of him watching a movie that night. Detective Frerichs played the January 1 voicemail during the interview; Goldstine denied that it was his voice. Exhibit 3e. The investigators were not misled by Goldstine's false statements, and they arrested him.

U.S. Sentencing Memorandum - 6
*United States v. Goldstine* / CR25-082 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**B.    Count 2: Unlawful Possession of Ammunition on March 17, 2025**

During the search of Goldstine's residence, Everett Police found approximately 712 rounds of ammunition in his bedroom closet.

Goldstine was not eligible to possess ammunition because he had previously been convicted of felony arson, burglary, and possession of stolen property. PSR ¶¶ 12-14, 52, 57-58.

**C.    Count 3: Unlawful Possession of a Firearm in September 2020**

While investigating the bombing, agents learned that Goldstine had been arrested in September 2020 for illegally possessing a gun and pointing that gun at people attending public protests. On September 4, 2020, there was a Black Lives Matter protest and a Back the Blue counterprotest at an intersection in Everett. Goldstine drove through the intersection and harassed the protestors. One of the attendees began filming Goldstine



U.S. Sentencing Memorandum - 7
United States v. Goldstine / CR25-082 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

and told him to "smile for the camera." Goldstine pulled out a gun, pointed it at the person with the camera, and then drove off. Exhibit 4.

Everett Police connected the vehicle to Goldstine and confronted him at his residence on September 17, 2020. Goldstine confessed to the incident and allowed Everett Police to recover the gun from a coffee table in his living room.

As previously mentioned, Goldstine was prohibited from possessing firearms due to prior felony convictions. Goldstine was charged with unlawful possession of a firearm in state court and released on his personal recognizance. That felony case was pending when Goldstine bombed the victims' car.

### III. SENTENCING CONSIDERATIONS

#### A. Sentencing Guidelines

##### 1. Hate Crime Motive

The United States agrees with Probation's offense-level calculations, except for its non-application of a three-level upward adjustment for "Hate Crime Motive" under U.S.S.G. § 3A1.1(a). This sentencing enhancement applies if "the court at sentencing determines beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived race or color . . . of any person." *Id.* Unlike many other aspects of the Guidelines that are proved by a preponderance of the evidence, the enhancement under § 3A1.1(a) must be proved beyond a reasonable doubt.

A defendant acts "because of" a victims' protected characteristic if the characteristic is a "but-for cause" of the defendant's actions. *Burrage v. United States*, 571 U.S. 204 (2014) (generally interpreting causal language, including "because of" and "results from" in federal criminal statutes to require proof of but-for causation unless "text or context" require otherwise). In *United States v. Patterson*, 119 F.4th 609, 615 (9th Cir. 2024), the Ninth Circuit held that the application of § 3A1.1(a) "requires a

U.S. Sentencing Memorandum - 8
*United States v. Goldstine* / CR25-082 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

finding that the defendant was motivated by hate or animus based on one of the protected characteristics" identified in that Guideline.

The PSR accurately recounts the overwhelming evidence of Goldstine's deeply held animus toward black people. PSR ¶ 32. The question before the Court is whether Goldstine's well-established racial animus was a but-for cause of his decision to illegally possess the destructive device that he used to bomb a black couple's car. The evidence in this case establishes beyond a reasonable doubt that one of the reasons Goldstine went to the extreme lengths he did, in the outrageous way he did, was that VICTIM-1 and VICTIM-2 are black. The victims' race and color were the catalyst that elevated Goldstine's revenge from petty vandalism to a bombing.

Importantly, events often have multiple but-for causes. *Bostock v. Clayton Cty.*, 590 U.S. 644, 656 (2020) ("Often, events have multiple but-for causes."). "But-for causation is a relatively undemanding standard: a but-for cause of a harm can be anything without which the harm would not have happened." *United States v. George*, 949 F.3d 1181, 1187 (9th Cir. 2020) (interpreting but-for causation in the context of a Guideline enhancement for substantial financial hardship); *see also United States v. Salinas*, 918 F.3d 463, 466 (5th Cir. 2019) (recognizing that an event might have many but-for causes and describing but-for causation as "not a difficult burden to meet"). In the context of hate crimes, courts have routinely held that the government does not need to prove that racial animus was the sole, or even primary, motive for the offense. *See, e.g., United States v. Craft*, 484 F.3d 922, 926 (7th Cir. 2007) (recognizing, in a prosecution under 42 U.S.C. § 3631, that the government was not required to prove that racial animus was the defendant's sole motivation in a prosecution); *United States v. Johns*, 615 F.2d 672, 675 (5th Cir. 1980) ("The presence of other motives, given the existence of the defendants' motive to end interracial cohabitation, does not make their conduct any less a violation of 42 U.S.C. § 3631.").

U.S. Sentencing Memorandum - 9
*United States v. Goldstine* / CR25-082 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

The Probation Office determined that Goldstine's mental health symptoms create reasonable doubt as to whether Goldstine targeted VICTIM-1 and her property "because of" her race. PSR ¶ 32. But even assuming that Goldstine's bipolar disorder is a but-for cause of his offense, it is still apparent, beyond a reasonable doubt, that his hostility toward the victims' race was also a but-for cause of his offense. There is overwhelming evidence that Goldstine fixated on the victims' race and color when committing this offense. Likewise, there is overwhelming evidence that, despite a history of interpersonal conflicts with non-black people, Goldstine perpetrated a car bombing against only a black couple—in other words, Goldstine treated conflicts with the black victims differently than he treated conflicts with non-black individuals.

Goldstine was obsessed with revenge against the victims in part because he felt that being wronged by black people was a significant affront to him as a white person. In his words, "This crap of black people putting their hands on white people for no reason ain't flying no more." Exhibit 3a. His actions bear the hallmarks of the racial violence that led Congress to pass civil rights laws in the first place: a perceived insult to a white person, committed by a black person, punished by an extreme, public, and permanently damaging act of violence.

Goldstine's obsession manifested itself in numerous ways—from seeking out the victims' personal information, to carrying their personal information around in his pockets for "his personal needs," to harboring plans of vengeance against them for over a year, to constructing or acquiring a pipe bomb, to the act of using that homemade bomb to blow up a car parked outside a residential apartment complex, to taunting the victims the day after the bombing. These acts were outrageous and extreme, even for a person who was angry about being injured during a fight.

Moreover, while Goldstine has been involved in interpersonal conflicts with several non-black individuals, he reserved this most egregious of acts—a bombing—for a black couple. Goldstine has a history of lashing out, and several of his recent outbursts

U.S. Sentencing Memorandum - 10
*United States v. Goldstine* / CR25-082 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

have involved threats, assault, or property damage. But the dangerous and premeditated act Goldstine committed in this case—bombing the victims' car while it was parked outside their residence—exceeds any act of retaliation or violence that he committed against others within the same period. For example, Goldstine's landlord, a non-black individual, reported to federal investigators that Goldstine became verbally aggressive during a confrontation from one or two years earlier. *See* Exhibit 7 (Interview of W-2). But Goldstine did not bomb the landlord's car. On another occasion, one of Goldstine's neighbors, also a non-black individual, asked Goldstine to refrain from setting off fireworks near her home, as the fireworks would shake her windows. Goldstine called her a "bitch"—but he did not bomb her car. *See* Exhibit 8 (Interview of W-3). That conduct—making and detonating a bomb—was perpetrated only against VICTIM-1 and VICTIM-2. The variable that pushed Goldstine to such extremes with VICTIM-1 and VICTIM-2 was the victims' race.

Goldstine's bipolar diagnosis does not preclude a finding that racial animus was a but-for cause of his conduct. The Fourth Circuit recently addressed this issue in *United States v. Hudak*, 156 F.4th 405 (4th Cir. 2025), a hate-crime prosecution brought under 42 U.S.C. § 3631(a) and 18 U.S.C. § 245(b)(2). Both statutes require the United States to prove beyond a reasonable doubt that the defendant acted "because of" the victim's race or color. In *Hudak*, as in this case, the defendant asserted that his crime was attributable to worsening mental health symptoms that affected his impulse control, not racial motive (in *Hudak*, the defendant suffered from obsessive compulsive disorder or "OCD"). *Id.* at 408-09. In rejecting the defendant's argument, the court reiterated that events often have "multiple but-for causes" and that "[a] criminal defendant may violently attack his neighbor both because of the neighbor's race and because the defendant suffers from a mental illness that makes it challenging for him to control his behavior." *Id.* at 411 (emphasis in original). The court further observed that "the very act of violently attacking one's neighbor suggests that the defendant is not mentally sound" and "[i]n most cases

U.S. Sentencing Memorandum - 11
*United States v. Goldstine* / CR25-082 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

short of insanity, then, mental health evidence is besides the point." *Id.* "As long as the defendant would not have attacked his neighbor if the neighbor were a different race, the defendant has committed the attack 'because of' race within the meaning of § 3631(a) and § 245(b)(2)." *Id.* "Any other approach would allow mental health defenses to swallow the hate crimes laws" because, throughout our nation's history, racial violence has often been "committed by mentally disturbed people." *Id.*

The PSR describes Goldstine's medical history, including a psychiatric evaluation completed by Dr. Mark Koenen on July 3, 2025. *See* PSR ¶¶ 76-86. Notably, nothing in Dr. Koenen's report suggests that racism is a symptom of bipolar disorder. It's not. Dr. Koenen observed that mania can contribute to impulsivity, impaired judgment, stalking behavior, and violence, but one can infer that the defendant chooses who and what make him angry. VICTIM-1 and VICTIM-2 made Goldstine uniquely angry because of their race. The evidence demonstrates beyond a reasonable doubt that Goldstine would not have possessed the illegal pipe bomb that he used to bomb the victims' car if the victims had been a different race.  For that reason, the Court should apply the three-level enhancement under § 3A1.1(a).

### 2. Criminal History Category

Goldstine has several prior felony convictions for arson that do not score because of their age. *See* PSR ¶¶ 51-52, 57. Therefore, Goldstine's criminal history category is I for purposes of determining his Sentencing Guidelines range.

The Court should also compare Goldstine's criminal history to the criminal history of others typically in Criminal History Category I. *See United States v. Martin*, 278 F.3d. 988, 1002 (9th Cir. 2002) (discussing upward departures for underrepresented criminal history during the era of mandatory sentencing guidelines). Goldstine's criminal history is more serious than others who typically fall within Criminal History Category I. As further discussed in Section B, below, Goldstine's underrepresented criminal history results in a Sentencing Guidelines range that does not reflect the danger that Goldstine

U.S. Sentencing Memorandum - 12
*United States v. Goldstine* / CR25-082 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

poses to the public and is a basis for the Court to impose a sentence above the Guidelines range.

### 3. Final Guideline Sentence

Based on a total offense level of 24 and a Criminal History Category of I, Probation calculated Goldstine's Sentencing Guidelines range as 51 to 63 months. PSR ¶ 102. For the reasons set forth above, the United States asserts that three levels should be added to the total offense level, pursuant to U.S.S.G. § 3A1.1(a), yielding a total offense level of 26[1] and a Sentencing Guidelines range of 63 to 78 months.

### B. The § 3553(a) Factors Establish that a 78-month Sentence is Necessary to Reflect the Seriousness of these Offenses and Protect the Public.

After the Court determines the applicable Sentencing Guideline range, 18 U.S.C. § 3553(e) instructs the Court to "impose a sentence sufficient, but not greater than necessary" to effectuate the goals of sentencing. The United States respectfully submits that 78 months is a necessary and appropriate length of imprisonment, to provide just punishment for the egregious criminal conduct, account for Goldstine's history of violent behavior, promote respect for the law, and, most importantly, protect the public. The United States also recommends that the Court impose the full three-year term of supervised release authorized by statute and that Goldstine's conditions of supervision include mental health treatment, substance abuse treatment, a no-contact order with VICTIM-1 and VICTIM-2, and at least 12 months of location monitoring to provide additional protection for the victims.

#### 1. Goldstine's crimes were serious with several aggravating factors.

Goldstine's offenses are aggravating for reasons beyond his hate-crime motives, which were described in Section A.2.a., above. These other aggravating factors, in and of

---

[1] If three levels are added pursuant to U.S.S.G. § 3A1.1(a), then Count 1 becomes nine levels more serious than Count Group 1, and the one-level multiple count adjustment no longer applies. *See* PSR ¶¶ 43-45; *see also* U.S.S.G. § 3D1.4(c).

U.S. Sentencing Memorandum - 13
*United States v. Goldstine* / CR25-082 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

themselves, justify a 78-month sentence in this case.

First, Goldstine had been released on personal recognizance for a pending felony case in state court when he illegally possessed a pipe bomb <u>and</u> over 700 rounds of ammunition. That case itself was serious—he was charged with pointing the barrel of gun at unarmed bystanders on a sidewalk. <u>And</u> he was prohibited from even possessing a gun in the first place. Aside from being an extremely dangerous act in its own right, bombing the victims' car violated Goldstine's conditions of release in state court. The fact that Goldstine was unable to regulate his own behavior in the community—and instead escalated his behavior in the community—while he was under court supervision raises significant concern about Goldstine's future compliance and risk of recidivism in this case.

Second, Goldstine's criminal history is underrepresented by a Criminal History Score of I. Goldstine has four prior convictions for felony arson. Even though these prior convictions are decades old, the similarities between those convictions and Count 1 make Goldstine's conduct even more alarming. By failing to account for Goldstine's numerous prior acts of arson, the Sentencing Guidelines underrepresent the dangerousness of Goldstine's recent conduct and his risk of recidivism.

Third, Goldstine not only committed a horrible crime, he delighted in having done so. The voicemail he left VICTIM-1 is hateful and cruel. VICTIM-1 received Goldstine's voicemail—gloating about the bombing and insulting her in the most offensive and racist ways—on New Year's Day while she and her husband were already dealing with the stress of having no transportation, dealing with an insurance claim, and figuring out how to replace their exploded car. Goldstine's conduct had severe emotional impacts, as well. Even to this day, VICTIM-1 is traumatized and feels afraid. In contrast, Goldstine told his therapist that he was having a "fantastic new year" because "Those people who assaulted me, their car got shot up to outer space. They won't be driving it anymore." Koenen Report, p. 14. The Sentencing Guidelines simply do not account for the kind of

U.S. Sentencing Memorandum - 14
*United States v. Goldstine* / CR25-082 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

malice that Goldstine exhibited in this case. He destroyed one of the most essential and expensive items a person owns, in one of the most violent ways possible, right outside the victim's home, and then taunted her the next day.

Finally, Goldstine not only illegally possessed a pipe bomb and a firearm, he also used each of these items to threaten and intimidate other people. That extra violence elevates the seriousness of Goldstine's crimes relative to other cases involving illegal possession of destructive devices and firearms and necessitates a significant prison sentence.

### 2. Goldstine's mental health history does not excuse the severity of his crimes or his responsibility for them.

Goldstine undoubtedly suffers from a mental health condition that contributes to his criminal behavior. He also makes choices that exacerbate the serious public safety risks inherent in his condition, for example, by using illegal drugs, discontinuing needed medications, and failing to follow through with necessary treatments.

Equally important, although bipolar disorder exacerbates impulsive behavior, Goldstine's possession and use of a pipe bomb was not an impulsive act. A pipe bomb is a rare and unusually dangerous item; it is not commonly possessed by people in the community. Constructing or acquiring a pipe bomb requires extensive research and planning. Even Goldstine's 10-minute walk from his residence to the victim's residence, under cover of darkness, was evidence of premeditation, not impulsiveness. Those were ten minutes in which he reflected on his actions. Those were ten minutes in which he could have turned around, but didn't.

After the bombing, Goldstine's actions showed malice, but not impulsiveness. After an evening to reflect on what he had done, he did not show remorse. Instead, he took a victory lap in the victims' faces by calling them to gloat. In the days and weeks

U.S. Sentencing Memorandum - 15
*United States v. Goldstine* / CR25-082 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

that followed, he told his therapists how thrilled he was that he had meted out his own brand of justice.

In sum, Goldstine's mental health issues are an incomplete explanation for his anger, malice, and acts of violence. Goldstine's criminal behaviors are also grounded in his animosity toward minority communities and a core belief that he is entitled to respond violently to any perceived grievance, large or small. When the perceived wrong involved a black couple, Goldstine escalated his violence to a new and horrifying level.

### 3. A 78-month sentence is necessary to promote respect for the law, afford adequate deterrence, and protect the public.

There is a strong need for the Court's sentence to deter retaliatory violence—particularly racially motivated retaliatory violence—and to protect the public from the defendant.

Goldstine has a deeply troubling history of violence, dating back to several serious convictions for arson in the late '80s and early '90s. Violence has remained a consistent part of his life over the past five years, from assaulting a neighbor and fighting with police in 2019 (PSR ¶ 59), to pointing a gun at protestors in 2020 (PSR ¶¶ 15-16), to making death threats on YouTube in 2022 (PSR ¶ 32), to allegedly smashing gas station property in the spring of 2023 (PSR ¶ 65), to fighting with VICTIM-1 and VICTIM-2 in the fall of 2023, to allegedly vandalizing a public defender's office in September 2024 (Koenen Report, p. 10), to bombing VICTIM-1 and VICTIM-2's car at the end of December 2024 (PSR ¶¶ 7-9). Despite frequent intervention by courts, police, and mental health professionals, Goldstine has been unable to safely manage his behavior in the community. To put it more bluntly, despite his awareness of the harm he causes, Goldstine has not stopped causing harm.

The fact that Goldstine's mental health symptoms can be managed with a consistent treatment regimen is reason for optimism. The fact that Goldstine's symptoms

U.S. Sentencing Memorandum - 16
*United States v. Goldstine* / CR25-082 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

can return quickly if he chooses to abandon his treatment regimen is reason for profound concern. Goldstine has shown his tendency to become consumed by anger, malice, and revenge, and to lash out violently. He poses a significant danger to the public when that happens. We all hope that Goldstine will choose to take his medication and attend treatment appointments in the future. No one can guarantee that he will, and, in the past, he has chosen not to—with disastrous results. Therefore, the sentence that the Court imposes must account for the significant risk that Goldstine poses in the community, which is exacerbated by his history of non-compliant behavior.

## IV. CONCLUSION

For the foregoing reasons, the United States recommends a 78-month sentence, followed by three years of supervised release. The United States further recommends that the Court impose special conditions of supervision designed to mitigate the danger that Goldstine poses to the community from his violent outbursts, specifically, required compliance with mental health treatment and substance abuse treatment, no contact with VICTIM-1 and/or VICTIM-2 (including their residence), and at least 12 months of location monitoring.

DATED this 8th day of December 2025.

Respectfully submitted,

CHARLES NEIL FLOYD
United States Attorney

*s/ Jessica M. Manca*
JESSICA M. MANCA
Assistant United States Attorney
700 Stewart Street, Suite 5220
Seattle, WA 98101-1271
Telephone:   (206) 553-7970
Fax:              (206) 553-0882
E-mail:         Jessica.Manca@usdoj.gov

U.S. Sentencing Memorandum - 17
*United States v. Goldstine* / CR25-082 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| | |
|---|---|
| 1 | HARMEET K. DHILLON |
| 2 | Assistant Attorney General<br>Civil Rights Division |
| 3 | |
| 4 | *s/ Taylor Payne* |
| 5 | TAYLOR PAYNE<br>Trial Attorney |
| 6 | Criminal Section, Civil Rights Division |
| 7 | U.S. Department of Justice<br>150 M St. NE |
| 8 | Washington, DC 20002<br>Phone:      (202) 445-5579 |
| 9 | Email:      taylor.payne@usdoj.gov |
| 10 | Missouri Bar No. 72067 |

U.S. Sentencing Memorandum - 18
*United States v. Goldstine* / CR25-082 JHC

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970