THE HONORABLE JOHN H. CHUN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR25-082-JHC |
| Plaintiff, | |
| v. | MR. GOLDSTINE'S SENTENCING MEMORANDUM |
| STEVEN GOLDSTINE, | |
| Defendant. | |

I. INTRODUCTION

Steven Goldstine suffers from a mental illness that can cause him to act in frightening ways when untreated. He has pleaded guilty to using a homemade pipe bomb to destroy the car of a person who he blames for an assault he suffered a year earlier, and to pointing a firearm at protesters who were taunting and filming him several years before that. There is no question that these are serious, potentially dangerous crimes. They call for thoughtful consideration of what sentence will ensure the safety of the public in both the short and long term.

But the Court's consideration will not be aided by moralizing or fearmongering. Mr. Goldstine's language can be despicable, and his crimes are indisputably frightening, but they are not "hate crimes." In fact, during the roughly month-long period in December 2024 that Mr. Goldstine's mania was uncontrolled, he behaved in aggressive ways towards anyone he felt didn't treat him fairly—including the police, firefighters, his landlord, the Snohomish County Public Defender's Office, and other

MR. GOLDSTINE'S SENTENCING MEMORANDUM
(*United States v. Goldstine*, CR25-082-JHC) - 1

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

patients and staff at community health services. In his diminished state, skin color was irrelevant. Considered within this broader context, the race of the victim was not a "but for" cause of Mr. Goldstine's crime.

Similarly, while the probation officer argues that the 30-second trigger was long enough that others could have been hurt, *see* Sent. Rec. at 5, it is more relevant that Mr. Goldstine, even during a manic episode, clearly tried not to hurt anyone. His attack was focused on an empty car and, while the charge was powerful to damage the vehicle, it was not powerful enough to damage anything nearby. He committed the crime at night, when he knew the car was empty and when he could see no one was around. Had Mr. Goldstine wanted to hurt a person, he had the means and opportunity. But Mr. Goldstine instead focused on damaging property.

Neither is it true that "[t]he only way to protect the community from uncontrolled and impulsive conduct is incapacitation through imprisonment," as the probation officer asserts in recommending a guideline sentence. Sent. Rec. at 5. Mr. Goldstine lived in the community without violent incident for decades before committing the bombing crime. Week-by-week treatment records from January 2025 until his arrest in March 2025 show an almost immediate alleviation of symptoms after Mr. Goldstine began receiving medication and psychological treatment. He has continued to receive medication in prison and has had no difficulties with other staff or inmates. Dr. Mark Koenen's conclusion that Mr. Goldstine's illness is well controlled by medication, and the probation officer's observation that Mr. Goldstine is a totally different person when medicated, reflects the undeniably transformative results of treatment.

Finally, while medication compliance is always an issue, the Court should consider Mr. Goldstine's repeated efforts to get help when he realized he was losing control and the success of the medication compliance program employed in the four

MR. GOLDSTINE'S SENTENCING MEMORANDUM  
(*United States v. Goldstine*, CR25-082-JHC) - 2

FEDERAL PUBLIC DEFENDER  
1601 Fifth Avenue, Suite 700  
Seattle, WA 98101  
(206) 553-1100

months before his arrest. Those provide good reason to believe that Mr. Goldstine will be successful on supervision, provided the Court imposes appropriate supports and protections.

Considering the complete context, Mr. Goldstine respectfully asks the Court to sentence him to two years' imprisonment, followed by three years of supervised release, including up to a year in transitional housing. Mr. Goldstine is not dangerous when he is being treated, and a longer term of imprisonment may damage his chance of successful reentry in the future. U.S. Probation is well equipped to provide the significant support that Mr. Goldstine will need during reentry. He is motivated to accept that help. *See* Ex. 1 (Letter from Mr. Goldstine).

## II. BACKGROUND

### A. Personal history

Mr. Goldstine endured a chaotic childhood, marked by violence and neglect. His parents, siblings, and classmates abused him. PSR ¶ 70. Mr. Goldstine could not sit still or focus on his schoolwork, meaning that he developed a reputation for being "retarded." *Id*. Doctors later diagnosed Mr. Goldstine with Attention Deficit Hyperactivity Disorder. *Id*.

When he was 13 years old, Mr. Goldstine's mother began to suffer from mental illness. PSR ¶ 72; Ex. 2 at 6 (Psychiatric Evaluation). She developed a paranoid delusion that Mr. Goldstine was doing drugs and kicked him out of the house. *Id*. Mr. Goldstine lived on the streets for about the next six years, PSR ¶ 20, during which he sustained convictions for burglary, theft, shoplifting, and a serious conviction for arson at the age of nineteen, for which he received a 57-month sentence. Mr. Goldstine never targeted people (as opposed to property) and did not target anyone based on race.

During his adolescence on the street, Mr. Goldstine began exhibiting signs of Bipolar 1, a serious mental illness characterized by periods of intense sadness, followed

MR. GOLDSTINE'S SENTENCING MEMORANDUM
(*United States v. Goldstine*, CR25-082-JHC) - 3

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

by manic periods that can include psychosis and impulsivity. Ex. 2 at 5, 8–10. People like Mr. Goldstine may also have mixed episodes, which combine the debilitating effects of both manic and depressive phases. *See* "Bipolar Disorder," https://my.clevelandclinic.org/health/diseases/9294-bipolar-disorder [https://perma.cc/3NGT-G5PY] (accessed December 8, 2025). During these periods, Mr. Goldstine does not sleep, becomes paranoid, and perseverates on perceived or actual injustices. Ex. 2 at 8–10.

Despite his illnesses, Mr. Goldstine avoided serious contact with law enforcement for roughly thirty years after leaving prison. PSR at 11–12. During this time, Mr. Goldstine did not receive consistent treatment, but he often abused depressant drugs to quiet his mind. Mr. Goldstine began abusing heroin and fentanyl about seven years ago, before finding methadone therapy. *See* Ex. 3 at 28. Shortly before he destroyed the victim's car, Mr. Goldstine began abusing Xanax. He thought that Xanax would help calm him, but instead it aggravated his symptoms.[1] *See id.* at 20 ("He reports mood has stabilized since he discontinued use of illicit Xanax.").

B.   **The offenses**

Mr. Goldstine has pleaded guilty to three crimes. For sake of clarity, their underlying facts are presented out of order.

1.   **Counts 2 and 3:**

During the Black Lives Matter protests in 2020, Mr. Goldstine was a strong supporter of the Blue Lives Matter counter movement. He came across one of the protests while driving to Safeway and Riley's Auto Parts. Protesters were jumping on cars. When Mr. Goldstine began berating the protesters from his car, other protesters began filming Mr. Goldstine. Mr. Goldstine then turned and pointed a firearm at the

---

[1] Reactions of this type to Xanax abuse have been documented, albeit rarely. Drugs.com lists known psychiatric side effects that can include agitation, "adverse behavioral effects," mania, aggressiveness, rage, and suicide.

MR. GOLDSTINE'S SENTENCING MEMORANDUM
(*United States v. Goldstine*, CR25-082-JHC) - 4

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

(white) people filming him. That conduct, which is caught on film, is the basis for Count Three.

Police arrested Mr. Goldstine and seized his firearm about two weeks later. For reasons unknown to the defense, the state did not pursue charges for pointing the firearm at the protestors. When police searched Mr. Goldstine's home and car in 2025, they did not find a replacement firearm, though he still had ammunition for the firearm seized by law enforcement almost five years earlier. Possession of that ammunition, albeit even without a firearm to use it, is the basis for Count Two.

### 2. Count 1

The facts underlying Count 1 are complicated and at least partly disputed. Counsel has provided recordings of the witness statements should the Court find them useful in resolving any disagreements. Ex. 4 (Interview of C.J.); Ex. 5 and 6 (Interview of Victim, Part 1).

Mr. Goldstine previously was friends with a man named Jerry and his wife, both of whom lived downstairs from the victim. Jerry dealt drugs, and Mr. Goldstine visited him frequently. During these visits, Mr. Goldstine, Jerry, and his wife often smoked on the public sidewalk outside the apartment complex.[2]

Jerry and his wife battled with their upstairs neighbor, who is in poor health and understandably did not want the smoke going into her room. The conflict grew heated and petty, with Jerry's wife moving the victim's chair to irritate her. The victim often called the landlord for help. Jerry and his wife would scream at the victim, who (by her own account) gave as good as she got. Ex. 6 at 19:15 (Interview of Victim, Part 2), et seq. Mr. Goldstine was often present. On one occasion, the victim introduced herself to Mr. Goldstine without incident. Ex. 6 at 13:59.

---

[2] Counsel understands that both Jerry and his wife have since died of drug overdoses.

MR. GOLDSTINE'S SENTENCING MEMORANDUM
(*United States v. Goldstine*, CR25-082-JHC) - 5

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

About a year before the bombing, Mr. Goldstine was smoking with Jerry and his wife as they argued with the victim. According to the victim, when Mr. Goldstine went to his car, Jerry called her a "bitch ass n****r." Ex. 6 at 20:40. His wife then repeated the slur and laughed. Victim 1 reported that when Mr. Goldstine returned from his car, he repeated the slur a third time and also laughed. Mr. Goldstine denies using this language at that time.

The victim called her husband, C.J., and explained that Jerry, his wife, and Steven had called her a racist slur. C.J. confronted Jerry and his wife, Ex. 4 at 4:08, and became determined to "talk to" Mr. Goldstine. *See also* Ex. 5 at 22:16 (Victim 1 knew there would be trouble because her husband "want[ed] to get Steve."). The next time that Mr. Goldstine visited Jerry, Mr. James waiting for him outside. When Mr. Goldstine went out to talk to Mr. James, someone knocked him down from behind. Mr. James and a friend then stomped on Mr. Goldstine, leaving him with multiple facial fractures, bleeding in his brain, and broken ribs. Ex. 7 (Photo of Injury). A camera in Mr. Goldstine's car showed the victim circling in her car while he was beaten, and then later driving away with the second assaulter. Ex. 8. (ROI). Mr. Goldstine's ribs did not set correctly, so he continues to suffer painful nerve damage along one side of his body. Ex. 9 (Providence Record).

C.J. has never denied injuring Mr. Goldstine, though he has claimed (falsely) that he beat him in self-defense. *See* Ex. 4 at 4:50 (explaining that after Mr. Goldstine allegedly pulled a knife, C.J. "attacked him and beat him up real bad" until the ambulances arrived). Nonetheless, Everett Police Department refused to investigate the assault or to charge C.J. Notably, the victim received the same dismissive treatment from Everett Police when she complained about Jerry and his friends. *See* PSR at ¶ 22 ("Victim 1 has been repetitively dismissed by the Everett Police Department when she

MR. GOLDSTINE'S SENTENCING MEMORANDUM
(*United States v. Goldstine*, CR25-082-JHC) - 6

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

has sought help with the harassment, with one officer accusing her of wanting them to hold her hand, and one dispatcher hanging up on her.").

For about a year after his assault, Mr. Goldstine tried to persuade the police to help him get justice for his assault. He gathered evidence in support of his claim, including the victim's phone number, the license plate of her car, and the video from his own car. Though he repeatedly visited the Everett Police Department, officers refused to even take a report. Mr. Goldstine tried to show this evidence to federal agents when they arrested him for this case. Ex. 8. Mr. Goldstine perseverated on the unfairness of his treatment, particularly the refusal of the police to help him obtain justice. Ex. 2 at 10. Finding himself growing angrier, he began abusing Xanax, which made his symptoms worse. *See* Ex. 3 at 20 ("I thought Xanax would calm me down, and it did the opposite."). In September 2024, Mr. Goldstine realized that he was losing control and needed help. He recorded a suicide video, Ex. 10, checked himself into a hospital, and agreed to a psychiatric hold.[3] At intake, Mr. Goldstine reported thoughts of suicide by overdose or by cop. He expressed a desire to attack police officers (regardless of their race) because they did not protect him or take him seriously. Ex. 11 (Smokey Point Behavioral Hospital Records). Mr. Goldstine remained in custody for ten days, during which he was so highly medicated that he has little memory of his stay. At the end of that period, the hospital elected not to seek another involuntary hold, but also declined to provide a follow-up plan.

Mr. Goldstine therefore was released to the community without any meaningful support. He returned to abusing benzodiazepines and began perseverating on his mistreatment again. Mr. Goldstine's manic symptoms grew worse. When the Snohomish County Public Defender's Office declined to help him "obtain justice," Mr. Goldstine vandalized the office. *See* Ex. 2.

---

[3] The hold later became involuntary.

MR. GOLDSTINE'S SENTENCING MEMORANDUM
(*United States v. Goldstine*, CR25-082-JHC) - 7

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

There is no evidence that this conduct was motivated by race or caused by anything other than Mr. Goldstine's seriously diminished mental state. However, on December 31, 2025, at night and when no one was present, Mr. Goldstine tossed an explosive device through the back windshield of the victim's car. Ex. 12 (Photos of Damaged Car). The next day, he phoned to taunt the victim about the crime. Mr. Goldstine acknowledges using a racist slur in that call.

### C. Post-offense recovery

Almost immediately after destroying the car, Mr. Goldstine sought mental health treatment at Island Crossing Counseling Services. Records of his treatment there show its remarkable efficacy. *See* Ex. 3.

During his initial visit in the first week of January 2025, Mr. Goldstine confronted another patient and staff who he perceived as acting aggressively towards him. Ex. 3 at 3. ICCS staff explained that they would not provide treatment unless Mr. Goldstine submitted to supervised medication. They warned that they would cease counseling if he continued to be disruptive. *Id*. Mr. Goldstine agreed to those terms. *Id*. at 24. Then, for the next three and half months, he complied perfectly with his medication and psychotherapy treatment. There were no other concerns about his behavior.

On January 6, 2025, a week after the lobby confrontation and the first visit for which therapy notes exist, Mr. Goldstine presents in a highly altered state. *Id.* at 24–26. The treatment provider quotes Mr. Goldstine celebrating his attack on the car of the "those [Black] people who assaulted me" and bragging about how he also threatened to assault the (not Black) property manager for stealing his money. He reports abusing Xanax and said that he could only fall asleep with trazodone. *See* Ex. 3 at 23. Mr. Goldstine asked the treatment provider to help him feel calmer. *Id*.

MR. GOLDSTINE'S SENTENCING MEMORANDUM
(*United States v. Goldstine*, CR25-082-JHC) - 8

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

By his next session, Mr. Goldstine was transformed. After about three weeks of medication compliance, "Steven appeared calmer, responsive and emotionally regulated. He was open in discussing trauma and family dynamics and gained insight into how his need for control and rigidity may be a result of the helplessness he experienced during his childhood." Ex. 3 at 20. Two weeks after that, Mr. Goldstine had improved even more: "Steven was receptive, calm and conversant. He was emotionally regulated throughout sessions, even when discussing distress issues. He appears to have adequate impulse control and is interested in selfcare activities." By February 11, 2025, Mr. Goldstine was "managing impulsivity," though the therapist notes poor insight into the reasons for his improvement. *Id*. at 14. Follow-up notes reflect that Mr. Goldstine suffered from "rigid thinking," but also that "Steven is willing to sit through uncomfortable feedback and remain emotionally regulated. Impulse control has Improved." *Id*. at 11.

Mr. Goldstine's arrest on March 17, 2025, brought an abrupt end to this progress. The last records show that: "Steven was beginning to engage fully in mental health services, with medication regimen compliance. He attended MH counseling session bi-monthly, SUD counseling sessions monthly, and medication management appointments monthly." Ex. 3 at 3. With medication and psychotherapy, Mr. Goldstine also had begun to show much better insight into way that mania and drug abuse affected his conduct: "He is managing symptoms of mania and delusions without threats or reported property damage. Psychotropic medications were prescribed and managed by Dr. Gina at ICCS, and he is now taking them at night, in his own home to limit sleepiness during the day. He is slowly working through the trauma skills workbook and agreed to add DBT for distress tolerance to increase skill around things he cannot change." *Id*. at 5.

MR. GOLDSTINE'S SENTENCING MEMORANDUM
(*United States v. Goldstine*, CR25-082-JHC) - 9

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

Mr. Goldstine's therapists concluded their records by expressing concern about how imprisonment could affect his progress:

> Risk/Protective Factors at time of Discharge: Steven is currently in federal custody and is at high risk for decompensation without medications.
>
> MHC'S recommendations for continuum of mental health services type and frequency of follow-up contacts: Steven would benefit from medication management within the penal system, and mental health counseling to address severe, complex trauma.

Ex. 3 at 4.

Mr. Goldstine receives medication within the Bureau of Prisons but does not receive mental health counseling. His manic symptoms appear to be in complete remission. However, the elimination of psychotherapy has paused any progress in addressing his severe, complex trauma.

### III. SENTENCING REQUEST UNDER § 3553(A)

#### A. The history and circumstances of the offense and nature and characteristics of the offender

Mr. Goldstine's conduct—pointing a firearm and destroying a vehicle—is undoubtedly dangerous. At the same time, the potential for harm should not overwhelm the fact that Mr. Goldstine took real steps to avoid hurting anyone. He did not fire the gun or replace it when it was taken by police. He attacked the victim's car, not her person, in retaliation for her husband's terribly violent attack on him. And by using a small explosive, at night, he chose circumstances that were designed not to cause harm to other property or people.

Mr. Goldstine's traumatic personal history and mental illness are mitigating, particularly because the record shows his illness can be effectively treated. Perhaps even more important are Mr. Goldstine's repeated efforts to get help, even when

MR. GOLDSTINE'S SENTENCING MEMORANDUM
(*United States v. Goldstine*, CR25-082-JHC) - 10

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

untreated. In September 2024, he checked himself into the hospital rather than hurting himself or others. And he complied perfectly with treatment and counseling at ICCS when they imposed a supervised medication program. As the probation officer notes, "[w]hile medicated, Mr. Goldstine exhibits completely different behavior." Sent. Rec. at 6. These efforts to get help, combined with his progress in treatment before arrest, confirm both that Mr. Goldstine can learn to sense manic phases and get help, and that he wants better control of his mind.

### B. The needs to punish, deter, protect, and reflect the seriousness of the offense

Courts have recognized "the belief, long held by this society, that defendants who commit criminal acts that are attributable . . . to emotional and mental problems[ ] may be less culpable than defendants who have no such excuse." *California v. Brown*, 479 U.S. 538, 545, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring). Offenders suffering from mental illness are less culpable because they have a diminished ability to make reasoned decisions. While there may be other reasons for imprisonment, it offends justice to punish someone who is receiving treatment for crimes he would not commit in his present state.

The probation officer is correct, also, that deterrence is of little relevance here. While suffering from psychotic mania, Mr. Goldstine's thinking is not rational enough to be deterred. And there is no evidence at all that rational people who damage cars or point guns will be deterred by the sentence in this case.

Most salient are the needs to protect the public and reflect the seriousness of the offense. Although no one was hurt, Mr. Goldstine's crimes justify the significant penalty of two years' imprisonment and potentially a third year in community confinement. But a longer sentence would be "greater than necessary" to protect the public. In the long term, that factor will be best served by returning Mr. Goldstine to the

MR. GOLDSTINE'S SENTENCING MEMORANDUM
(*United States v. Goldstine*, CR25-082-JHC) - 11

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

program of mental health treatment—counseling and medication—that provided such transformative benefits him in the months between the commission of his offense and his arrest.

### C. The needs to provide treatment and rehabilitative services in the "most effective manner"

To be effective in the long term, treatment for Bipolar 1 should include a combination of psychotherapy (talk therapy), medication, self-management strategies (like education and identifying the early symptoms of an episode or possible triggers of episodes); healthy lifestyle habits; and "other therapies, such as electroconvulsive therapy (ECT) in cases that are poorly responsive to medication." *See* "Bipolar Disorder," https://my.clevelandclinic.org/health/diseases/9294-bipolar-disorder [https://perma.cc/3NGT-G5PY] (accessed December 8, 2025). Mr. Goldstine also suffers from PTSD, related to his "complex trauma. Effective treatment for PTSD requires "trauma focused" talk therapy. *See* "PTSD: National Center for PTSD," U.S. Department of Veterans Affairs, https://www.ptsd.va.gov/understand_tx/tx_basics.asp#:~:text=Studies%20show%20that%20certain%20talk,about%20Talk%20Therapies%20for%20PTSD [https://perma.cc/JD99-8S5K] (accessed December 8, 2025).

Of these, Mr. Goldstine will receive, at most, medication while in BOP custody. Although medication is sufficient to stabilize his mania, it provides no tools to ensure he can safely reenter the public. In fact, some research shows that prolonged imprisonment is likely to worsen Mr. Goldstine's condition. *See* Katie Rose Quandt & Alexi Jones, "Research Roundup: Incarceration can cause lasting damage to mental health," *The Prison Policy Initiative* (May 13, 2021), https://www.prisonpolicy.org/blog/2021/05/13/mentalhealthimpacts [https://perma.cc/E52T-2STC].

MR. GOLDSTINE'S SENTENCING MEMORANDUM
(*United States v. Goldstine*, CR25-082-JHC) - 12

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

Effective treatment of Mr. Goldstine's mental health is central to every other sentencing factor, from punishment to protection of the public. There is no doubt that he will receive treatment "most effectively" in a community confinement setting.

### D. The Sentencing Guidelines and unwarranted disparity

#### 1. The Court should depart downward six levels based on Mr. Goldstine's mental condition and to accomplish a specific treatment purpose.

Congress recognized the relevance of mental illness when it required the Sentencing Commission to consider a defendant's "mental and emotional condition to the extent that such condition mitigates the defendant's culpability or to the extent that such condition is otherwise plainly relevant." USSG ch. 1, pt. A, p.3 (quoting 18 U.S.C. § 994). Prior editions of the Guidelines discharged this obligation by authorizing a departure for mental and emotional condition. *See* §5C1.1 ("Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines . . . In certain cases a downward departure may be appropriate to accomplish a specific treatment purpose.").

Although the 2025 Guideline Manual eliminates departures, Mr. Goldstine respectfully suggests that the 2024 Manual, which was in place at the time of his conduct, requires a significant downward departure. The record amply shows that Mr. Goldstine's treatable mental illness caused his misconduct. Certainly, the severity of his illness distinguishes his case from the "typical" defendant.

#### 2. The Court should not impose a "hate crime" enhancement

USSG §3A1.1 provides for a three-level adjustment if the government proves, beyond a reasonable doubt, that Mr. Goldstine targeted the victim because of their race. The government argues that this standard requires that it show that race was a "but for"

MR. GOLDSTINE'S SENTENCING MEMORANDUM
(*United States v. Goldstine*, CR25-082-JHC) - 13

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

cause of his attack. That is, the government acknowledges that Mr. Goldstine had had several reasons for destroying the victim's car, but believes the record proves beyond a reasonable doubt that he would not have destroyed the victim's car "but for" her race.

Mr. Goldstine disagrees with the government's characterization of its burden. *See United States v. Patterson*, 119 F.4th 609, 612 (9th Cir. 2024) (agreeing with appellant that "but for" causation is the wrong standard).[4] *See also id*. at 615 ("[N]ot all attacks 'because' a victim is black are . . . racially motivated in the relevant sense.") (internal quotation omitted). But the hate crime enhancement would not apply even under the government's preferred "but for" standard. First, Mr. Goldstine is a "different person" when treated. Even if the Court suspects that Mr. Goldstine would have resented the victim, or used racist language in his mind, there is no basis for concluding that he was tipped into committing this crime for any reason other than his uncontrolled mental illness—the same illness that had caused him to be institutionalized two months earlier and for which he sought help at community mental health about five days later.

The government also cannot prove that race was a "but for" cause because there is ample evidence that, during the same episode, Mr. Goldstine targeted other people he believed treated him unfairly, without any consideration of their race. He vandalized the public defender's office, for example, and threatened police officers and firefighters. When Mr. Goldstine confronted a (non-Black) patient at his community health center, and then center staff, there is no evidence that the unknown race of the patient or staff was relevant to him. And, of course, while Mr. Goldstine's messages include hateful language, his record shows no history of targeting people based on race. The protester

---

[4] The Ninth Circuit requires the government to prove beyond a reasonable doubt that the crime was "motivated by hate or animus." *Patterson*, 119 F.4th 609, 611 (9th Cir. 2024). Here, the motivation for his crime was indisputably a desire for "justice." Counsel has focused on the government's "but for" standard, which it derives from an out of circuit cases and its view of general principles set down by the Supreme Court, because Mr. Goldstine succeeds even under that notably laxer standard.

MR. GOLDSTINE'S SENTENCING MEMORANDUM
(*United States v. Goldstine*, CR25-082-JHC) - 14

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

who filmed him in 2020 is white. The victims of the crimes he committed 35 years ago are also white. Mr. Goldstine's landlord, V.P., said that he was not aware of any racially motivated incidents involving Mr. Goldstine, and told investigators that Mr. Goldstine had never used racially charged language with him. Ex. 13. (Interview with V.P.). Mr. Goldstine's neighbor acknowledged that he had negative feelings towards Black people, but also emphasized that he "was not very tolerant of people in general." Ex. 14 (Interview with E.K.).

### 3. A two-year sentence, coupled with one year in transitional housing, will not create unwarranted sentencing disparity.

In order to discharge its overarching goal of imposing a sentencing "sufficient, but not greater than necessary" to satisfy the statutory purposes of sentencing, this Court must consider not just "the need to avoid unwarranted disparities, but also . . . the need to avoid unwarranted *similarities*." *Gall*, 552 U.S. at 55 (emphasis in the original). That is, the Court would err by treating Mr. Goldstine like other defendants, with similar records, who commit similar crimes, but who are not suffering from serious, treatable mental illness when they do so.

### 4. The correctly calculated Guideline range

Mr. Goldstine otherwise agrees with the probation officer's Guideline calculations. With the additional six-level departure, Mr. Goldstine's Guideline range is 27–33 months.

### E. Restitution.

There has been no request for restitution.

## IV. CONCLUSION

As a result of this arrest, Mr. Goldstine has lost his subsidized housing and all his belongings. The Court's sentence therefore must ensure that he receives medication,

MR. GOLDSTINE'S SENTENCING MEMORANDUM
(*United States v. Goldstine*, CR25-082-JHC) - 15

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

psychotherapy, and addiction treatment, and also that he releases into a stable-housing environment.

A significant term in community confinement seems perfectly calibrated to provide these services, while also providing the high level of monitoring necessary to ensure public safety. *See* USSG §5F1.1. Mr. Goldstine will benefit from the structure provided, but also will have access to treatment services he will not have in custody. And, if the Court instead chooses to impose a probationary sentence, it can extend supervision to five years and retain the authority to re-sentence Mr. Goldstine up to the statutory maximum if his conduct warrants it.

Mr. Goldstine therefore asks the Court to impose a two-year term of imprisonment, followed by a three-year term of supervision, with the condition that Mr. Goldstine reside for up to 12 months in community confinement. This will punish his conduct, place meaningful and stabilizing distance between the crime and his release and ensure that he returns to the community in the best position to receive the services that will ensure he does not pose a continuing risk to public safety.

DATED this 8th day of December 2025.

Respectfully submitted,

s/ *Gregory Murphy*
Assistant Federal Public Defender
Attorney for Steven Goldstine

MR. GOLDSTINE'S SENTENCING MEMORANDUM
(*United States v. Goldstine*, CR25-082-JHC) - 16

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100